GRACE TAYLOR McRORIE AND HUSBAND, HOWARD S. McRORIE AND ELIZABETH TAYLOR BURGESS, WIDOW PLAINTIFFS AND KENNETH B. CRUSE, ADDITIONAL PLAINTIFF v. J. CLAY QUERY AND WIFE, OLLIE M. QUERY DEFENDANTS AND HARRY A. MARTIN AND WIFE, ALTON ERWIN MARTIN ADDITIONAL DEFENDANTS

No. 7619SC644

(Filed 16 February 1977)

1. Equity § 2— ejectment action — plea of laches proper

Plaintiffs' contention that the defense of laches was inapplicable in an ejectment action is without merit.

2. Equity § 2— action brought within statutory period of limitations — laches nevertheless existent

Plaintiffs could be guilty of laches, even though their action for ejectment was brought within any applicable period of limitation, if their delay in bringing the action was mere neglect to seek a known remedy, the delay was without reasonable excuse, and injury would otherwise be done to defendant by reason of the delay.

3. Equity § 2— laches — lapse of time — inequity resulting from delay — notice of claims

Lapse of time is not the controlling or most important element to be considered in determining whether laches is available as a defense; rather, the question is primarily whether the delay in acting results in an inequity to the one against whom the claim is asserted based upon some change in the condition or relations of the property or the parties. Also to be considered is whether the one against whom the claim is made had knowledge of the claimant's claim and whether the one asserting the claim had knowledge or notice of the defendant's claim and had been afforded the opportunity of instituting an action.

4. Equity § 2— ejectment action — sufficiency of evidence of laches

In an action for ejectment evidence was sufficient for submission to the jury on the question of laches where such evidence tended to show that defendant occupied property claimed by plaintiffs; plaintiffs did not make their claim known to defendant until institution of this action; plaintiffs knew that a house was located on the property and that defendant lived in it; defendant made considerable improvements to the house; and plaintiffs delayed bringing this action for three years, the only reason given by them being that they wanted to try another action against another person first.

APPEAL by plaintiffs and additional plaintiff from *Albright, Judge.* Judgment entered 8 March 1976, Superior Court, CABARRUS County. Heard in the Court of Appeals 12 January 1977.

This action in ejectment was instituted by plaintiffs on 10 June 1968. Plaintiffs were then represented by Kenneth B.

Cruse, who prepared and filed their verified complaint. On 3 August 1968, Harry A. Martin and wife, Alton Erwin Martin, petitioned the court that an order issue making them parties defendant, and this was done on the same date. In their verified answer to plaintiffs' complaint, defendants Query and Martin, prayed that an order issue making Kenneth B. Cruse an additional party plaintiff to the action, and the order prayed for was entered on 12 September 1968.

Original plaintiffs alleged in their complaint that they are the owners of a parcel of land described therein by metes and bounds and " . . . being the North half of Lot No. 1 in the George M. Misenheimer Estate" and " . . . entitled to the possession, use and enjoyment of said land, and to the rents and profits therefrom . . . " , but that " . . . the defendants J. Clay Query and wife Ollie M. Query are in possession of said land and claiming to own the fee in same under and by virtue of a deed from Harry A. Martin and wife, Alton Erwin Martin, dated March 12, 1947, recorded in Book 201, page 198, in the Register's office of Cabarrus County, N. C., to J. Clay Query and wife, Ollie M. Query . . . "

By their answer and amendments thereto defendants plead ownership of the fee, adverse possession for more than 20 years, adverse possession for more than 7 years under color of title, laches, and entitlement to $15,000 for permanent improvements placed on the property should plaintiffs prevail.

Plaintiffs and additional plaintiff filed a joint reply denying the material averments of the further defenses.

Plaintiffs and defendants filed motions for summary judgment, both of which were denied, the court finding that the defense of laches raised by defendants was a proper matter for resolution and a trial on the merits.

By way of pretrial order, the parties stipulated, *inter alia,* to the following undisputed facts:

"(a) Counsel for the defendants acknowledged to the Court that the counsel for the plaintiffs will request the Court to take judicial notice of the following reported cases:

(1) TAYLOR v HONEYCUTT, 240 NC 105, 81 SE 2d 203 (1954);

(2) McRORIE v CRESSWELL, 273 NC 615, 160 SE 2d 681 (1968) ;

(3) McRORIE v SHINN, 11 NC App. 475, 181 SE 2d 773 (1971) certiorari denied, 279 NC 395 (1971) ;

(4) FISHER and QUERY v MISENHEIMER and McRORIE, 23 NC App. 595, 209 SE 2d 848 (1974), certiorari denied, 286 NC 413 (1975) ;

(5) McRORIE v QUERY, 23 NC App. 601, 209 SE 2d 819 (1974).

(b) Summons in a special proceeding, entitled CHAS. A. FISHER, Executor of George M. Misenheimer, deceased, petitioner v. CHAS. W. MISENHEIMER, ROSANNA MISEN-HEIMER AND SARAH MISENHEIMER, respondents was issued by the Clerk of the Superior Court for Cabarrus County on June 26, 1907.

(c) Chas. A. Fisher, Executor of George M. Misenheimer, deceased, filed a petition in said proceeding commenced on June 26, 1907, to sell certain lands belonging to George M. Misenheimer at the time of his death in order to pay the debts of the decedent's estate.

(d) The subject of this controversy is title to and owner-ship of a certain parcel of real property owned by George M. Misenheimer on the date of his death, which parcel of real estate is identified as the northern half of 'First Lot' or 'Lot No. 1.'

(e) In addition to the 1907 special proceeding, an addi-tional special proceeding was instituted by Chas. A. Fisher, executor, in 1908.

(f) George M. Misenheimer died testate on the 17th day of January 1907, a resident of Cabarrus County, North Carolina.

(g) The will of George M. Misenheimer was admitted to probate in the office of the Clerk of the Superior Court of Cabarrus County on February 1, 1907, and is of record in said office in Will Book 5, at page 60.

(h) Chas. A. Fisher qualified as executor of the estate of George M. Misenheimer and letters testamentary were

issued to him on or about February 2, 1907 by the Clerk of the Superior Court for Cabarrus County.

(i) At the time of his death, George M. Misenheimer was the owner of certain real property in Cabarrus County, North Carolina, referred to as follows:

    (1) 41½ acre tract;

    (2) 109-acre tract;

    (3) 38-acre tract;

    (4) First Lot or Lot No. 1 (containing 192 square poles);

    (5) Lot No. 2 (containing 221 square poles);

    (6) Misenheimer graveyard tract.

(j) The subject of this controversy is that parcel identified in the preceding paragraph as 'First Lot' or 'Lot No. 1.'

(k) George M. Misenheimer was survived by his widow, Sarah Misenheimer, a son, Chas. W. Misenheimer and a daughter, Rosanna Misenheimer, all of whom were more than twenty-one (21) years of age; that Sarah Misenheimer died in 1918 or 1919.

(1) Rosanna Misenheimer was married to one George G. Taylor on or about the 29th day of April 1914, who predeceased her.

(m) Rosanna Misenheimer Taylor died intestate on December 26, 1965, and was survived by two children, Elizabeth Taylor Burgess, born August 8, 1917, and Grace Taylor McRorie, born July 12, 1920, who were her sole heirs at law and who were the original plaintiffs in this action instituted by Kenneth B. Cruse, Attorney at Law, who was subsequently made an additional plaintiff upon motion of the defendants.

(n) Tracts (1), (2), (4), and (5) constituted the real estate embraced by the special proceeding instituted on June 26, 1907, to make assets to pay the debts and charges of administration of the estate of George M. Misenheimer, deceased.

(o) With reference to the 1907 special proceeding, the full purchase price was paid for tracts (1), (2), and (5), as

identified in paragraph (i) above. The Misenheimer grave-yard tract (6) is not involved in this controversy nor was it involved in the 1907 special proceeding. Deeds were executed and delivered to the purchasers of tracts (1), (2) and (5) by the commissioner. C. W. Misenheimer, brother of Rosanna Misenheimer, was the highest bidder for tract (4) identified as the 'First Lot' or 'Lot No. 1' and said bid was confirmed by the Court, as reflected in the special proceeding documents. C. W. Misenheimer and his sister, Rosanna Misenheimer, thereafter executed deeds of conveyance for Lot No. 1 (tract 4) and George M. Misenheimer's executor's Final Settlement of the estate reflects and reads as follows: '2 lots bid off by C. W. Misenheimer, never paid for and still belongs to the estate.' No deed executed by the commissioner for the First Lot or Lot No. 1 was ever recorded in the office of the Register of Deeds for Cabarrus County.

(p) The 38-acre tract referred to as tract (3) in paragraph (i) was sold in the special proceeding instituted on June 9, 1908 by Chas. A. Fisher, executor, to make additional assets to pay the debts and charges of administration of the estate of George M. Misenheimer, deceased, and the bid price was paid by the purchaser to the commissioner.

(q) Chas. A. Fisher, executor of George M. Misenheimer, and commissioner appointed by the Court to sell land to make assets to pay the debts of the decedent, George M. Misenheimer, is now deceased.

(r) Chas. W. Misenheimer, uncle of the feme plaintiffs and brother of their mother, Rosanna Misenheimer Taylor, is now dead.

(s) Rosanna Misenheimer Taylor, mother of the feme plaintiffs, is now deceased, having died on December 26, 1965.

(t) The Final Settlement filed by Chas. A. Fisher as executor of the estate of George M. Misenheimer of record in the office of the Clerk of the Superior Court for Cabarrus County is authentic and speaks for itself.

(u) Rosa Misenheimer and Rosanna Misenheimer (Taylor) were one and the same person.

(v) C. W. Misenheimer and Rosanna Misenheimer were brother and sister and the only children of George M. Misenheimer, deceased.

(w) The public records in Cabarrus County do indicate that both C. W. Misenheimer and his sister, Rosanna Misenheimer, executed deeds for the First Lot or Lot No. 1 in the defendants' chain of title.

(x) The defendants, J. Clay Query and wife, Ollie M. Query, claim title to one-half (½) of Lot No. 1 described in the 1907 special proceeding, and on other bases, by the following mesne conveyances recorded in the Register of Deeds office for Cabarrus County, North Carolina, to wit:

(1) Deed dated November 21, 1924 (for one-half interest) from Rosanna Taylor and husband, George Taylor, to Chas. W. Misenheimer, recorded in Deed Book 104, at page 238.

(2) Deed dated February ___, 1925 (for one-half interest) from Chas. W. Misenhemer and wife, Mae Misenheimer, to Rosanna Taylor, recorded in Deed Book 105, at page 137.

(3) Deed of trust from Rosanna Misenheimer Taylor and husband, G. G. Taylor, to J. L. Crowell, Trustee, for a one-half undivided interest, dated April 28, 1928, recorded in Mortgage Book 62, at page 172, which was foreclosed on August 31, 1935, and deeded November 22, 1935, by J. L. Crowell, Trustee, to Oza Mae Creswell by deed in Deed Book 116, at page 402.

(4) Deed dated January 29, 1936, for a one-half undivided interest from Chas. W. Misenheimer and wife, May V. Misenheimer, and Rosanna Misenheimer Taylor and husband, George Taylor, to Harry A. Martin, recorded in Deed Book 136, at page 217.

(5) Deed dated February ___, 1936, for a one-half undivided interest from Chas. W. Misenheimer and wife, May Misenheimer, and Rosanna Taylor and husband, George Taylor, to Oza Mae Creswell, recorded in Deed Book 134, at page 414.

(6) Deed dated March 28, 1936, by Oza Mae Creswell and husband, William L. Creswell, to Harry A. Martin

for all of their right, title and interest in one-half of said tract described as 'First Lot,' recorded in Deed Book 134, at page 464.

(7) Deed dated March 12, 1947, by Harry A. Martin and wife, Alton Erwin Martin, to J. Clay Query and wife, Ollie M. Query, recorded in Deed Book 201, at page 198.

(y) That C. W. Misenheimer and Rosanna Misenheimer Taylor and those claiming title by mesne conveyances set forth in Paragraph (x) above have had continous and un-interrupted possession of said property since June 1907.

(z) That the plaintiff, Kenneth B. Cruse, appeared as at-torney of record for the defendant in the case entitled 'Rosanna M. Taylor and Husband George G. Taylor v. J. J. Huneycutt,' instituted in the Superior Court of Cabarrus County on the 19th day of December, 1953, which was a controversy without action on an agreed statement of facts.

(aa) That by instrument under date of March 31, 1954, recorded on March 31, 1954, in Deed Book 250, at page 618, in the Cabarrus County Registry, Elizabeth Taylor Burgess and husband Paul B. Burgess remised, released and quitclaimed unto Kenneth B. Cruse 'an undivided one-half of all such right, title and interest as we, the said Elizabeth T. Burgess and husband Paul B. Burgess have or ought to have in or to all that piece, parcel, tract or lot of land lying in No. 4 Township, Cabarrus County, State of North Carolina, and described as follows: Being any and all lands to which we are or may be entitled under and by virtue of the terms of the will of George M. Misenheimer, admitted to probate in 1907 in Cabarrus County, State of North Carolina, but excepting that property on which Rosanna Misenheimer Taylor now resides, bounded on all sides by the lands of the Cabarrus Country Club, Inc.,' which deed is incorporated herein by reference.

(bb) That by instrument under date of April 5, 1954, recorded on April 6, 1954, in Deed Book 250, at page 635, in the Cabarrus County Registry, Grace Taylor McRorie and husband Howard McRorie remised, released and quit-claimed unto Kenneth B. Cruse 'an undivided one-half of all such right, title and interest as we, the said Grace T.

McRorie and husband Howard McRorie have or ought to have in or to all that piece, parcel, tract or lot of land lying in No. 4 Township, Cabarrus County, State of North Carolina, and described as follows: Being any and all lands to which we are or may be entitled under and by virtue of the terms of the will of the late George M. Misenheimer, admitted to probate in 1907 in Cabarrus County, State of North Carolina, but excepting that property on which Rosanna Misenheimer Taylor now resides, bounded on all sides by the lands of the Cabarrus Country Club, Inc.,' which deed is incorporated herein by reference.

(cc) That the lands excepted in the instruments referred to in Paragraphs (aa) and (bb) is the parcel of land referred to in Paragraph (i) above as Tract (6)."

The court ordered a separate trial upon all issues and claims relating to betterments and improvements and rents.

After plaintiffs introduced their evidence consisting of the pertinent documents filed in the 1907 and 1908 special proceedings, the final settlement of the Misenheimer estate, and deed of trust of defendants Query securing a loan from Citizens Building and Loan Association, defendants moved for directed verdict which was denied. At the close of all the evidence, all parties moved for directed verdict. Defendants' motion was denied. As to plaintiffs' motion, it was also denied except as to those portions directed to defendants' affirmative defenses based on the statutes of limitation and adverse possession.

All parties tendered issues which were refused by the court and the parties excepted. Plaintiffs moved that defendants be required to make an election of remedies and this motion was denied. The court submitted two issues:

"1. Is plaintiffs' claim for relief barred by plaintiffs' laches as alleged in the Answer?

ANSWER:

2. Are the plaintiffs the owners in fee simple of the northern half of Lot Number 1, and have they been since December 26, 1965, as alleged in the Complaint?

ANSWER:"

The jury answered the first issue "Yes" and, under instructions from the court, did not answer the second issue.

Plaintiffs moved for a judgment n.o.v. and for a new trial. Each was denied and plaintiffs appealed.

*Cole and Chesson, by James L. Cole, for plaintiff appellants.*

*Hartsell, Hartsell and Mills, P.A., by William L. Mills, Jr., for defendant appellees J. Clay Query and wife, Ollie M. Query.*

*Williams, Willeford, Boger and Grady, by John Hugh Williams, for additional defendant appellees Harry A. Martin and wife, Alton Erwin Martin.*

MORRIS, Judge.

This is the sixth time matters involving properties owned by George Misenheimer at the time of his death in 1907 have been before the Appellate Division of the General Court of Justice for review. In *Taylor v. Honeycutt,* 240 N.C. 105, 81 S.E. 2d 203 (1954), the Court was called upon to determine the interest of testator's daughter, Rosanna, (mother of the feme plaintiffs here) in certain lands devised by George Misenheimer. Rosanna had entered into a contract to convey the lands, had tendered a deed therefor, and defendant had refused to accept the deed and make payment for the land on the ground that Rosanna could convey only a life estate and not a fee. Action was instituted by Rosanna under G.S. 1-250 on an agreed statement of facts for a determination of her interest in the land. The will provided:

> "I bequeath and give the balance of my land and other property except my mill property to my beloved wife Sarah and daughter Rosanna Misenheimer their lifetime. Provided Rosanna has no heirs. Then it shall go to C. W. Misenheimer, my son, his lifetime and then to go to his heirs at his death.
>
> My interest in the mill property with what he owes me goes to C. W. Misenheimer."

Plaintiff contended that the rule in *Shelley's case* was applicable and resulted in Rosanna's taking a fee defeasible only by her death without children. The court disagreed and held that Rosanna took only a life estate but refrained from further interpretation of the will because none of the parties living or unborn who would or could be affected by further interpretation was a party either personally or by representation.

In 1968, in *McRorie v. Creswell,* 273 N.C. 615, 160 S.E. 2d 681 (1968), the Court was called upon to determine the

McRorie v. Query

interests of Grace Taylor McRorie and Elizabeth Taylor Burgess, daughters of Rosanna, the life tenant, and the same persons who are plaintiffs in the action now before us, in and to the southern half of Lot 1 of the George Misenheimer estate. (The action before us concerns the northern half of Lot 1.) There the defendants, purchasers by mesne conveyances from Rosanna, offered the same contention as Rosanna in *Taylor v. Honeycutt, supra.* Citing *Taylor v. Honeycutt, supra,* and holding that the principles enunciated there controlled, the Court again held that Rosanna took only a life estate. Further interpreting the will, the Court held that when she (Rosanna) died, her two children (plaintiffs therein) took the remainder in fee by clear implication upon the authority of *Hauser v. Craft,* 134 N.C. 319, 46 S.E. 756 (1904), and *West v. Murphy,* 197 N.C. 488, 149 S.E. 731 (1929). "Upon the death of Rosanna on 25 December 1965, plaintiffs' estate vested and defendant's terminated." 273 N.C. at 617, 160 S.E. 2d at 682. The Court affirmed the trial court's judgment that piaintiffs had the superior title and right to possession of the southern half of Lot 1. This action was brought on 8 September 1966, and the question of laches was not before the court.

Again in 1971, the questions involving the Misenheimer land were before the Court. In *McRorie v. Shinn,* 11 N.C. App. 475, 181 S.E. 2d 773, *cert. den.,* 279 N.C. 395, 183 S.E. 2d 242 (1971), the same plaintiffs sought to have the court declare them the owners of and entitled to possession to lands of George Misenheimer sold by Fisher, executor, to make assets. In this action they attacked the validity of special proceedings brought in 1907 and 1908. The several defendants offered 5 defenses, the first of which was the validity of the special proceedings and deeds of the commissioner—executor from which their chain of title derived. This Court held that the special proceedings were valid and affirmed the trial court's judgment in favor of defendants. That action was heard by the court without a jury on an agreed statement of facts. Although the opinion of the court was based upon the first defense, the defendants had, as their fifth defense, interposed a plea that the plaintiff were guilty of laches barring their recovery. As to that defense, Judge Britt, writing for the Court, said:

"At most the 1907 and 1908 special proceedings were irregular or voidable. It is well settled in this jurisdiction that the proper procedure for attacking an irregular or void-

McRorie v. Query

able judgment is by motion in the cause, 5 Strong, N. C. Index 2d, Judgments, Section 19, Page 38, and that such motion must be made within a reasonable time. *Menzel v. Menzel,* 254 N.C. 353, 119 S.E. 2d 147 (1961). It is admitted that plaintiff McRorie became 21 in 1941 and that plaintiff Burgess became 21 in 1938; the femme plaintiffs admit that they have lived in Cabarrus County in the general vicinity of the subject property during their entire lifetimes. Mrs. Burgess resided within sight of the property from the time of her birth until 1969, and they both had general knowledge of the improvements (valued at more than one million dollars) made from time to time upon the parcels of land deeded to the defendants. Plaintiffs' contention that they had no right to bring any type of action to attack the 1907 and 1908 proceedings until Rosanna died in 1965 is not supported by decisions of our Supreme Court. In *Menzel v. Menzel, supra,* the court said: 'It is true that the statute of limitations in an ejectment action does not begin to run against the remainderman until the death of the life tenant. "This does not mean, however, that such remainderman may not move to vacate a void or voidable judgment until after the expiration of the life estate. This he may do at any time if the action is taken seasonably and laches cannot be imputed to him." ' (Citations.) We think the femme plaintiffs waited an unreasonable time to attack the validity of the 1907 and 1908 proceedings, and the male plaintiff is bound by their unreasonable delay." 11 N.C. App. at 482, 181 S.E. 2d at 777.

Action involving the identical lot of land involved in the case *sub judice* was before us in *Fisher v. Misenheimer,* 23 N.C. App. 595, 209 S.E. 2d 848 (1974), *cert. den.,* 286 N.C. 413, 211 S.E. 2d 217 (1975). The action now before this Court was instituted on 10 June 1968, wherein plaintiffs base their claim upon the fact that Lot 1 of the Misenheimer estate was never sold by the commissioner in the special proceedings and remained a part of the estate. It is undisputed that the land was in the special proceedings, was bid in by C. W. Misenheimer but that the amount bid was never paid and no deed ever given therefor by the commissioner. While the action *sub judice* was pending, and on 18 November 1971, defendants Query filed a motion in the 1907 special proceedings requesting that an executor, c.t.a., d.b.n., and commissioner be appointed by the court

to complete the administration of the George Misenheimer estate and the special proceedings and that the commissioner be directed to execute a deed to the Querys, who tendered payment of the amount of the bid plus interest. The plaintiffs here (Mrs. McRorie, Mrs. Burgess and Cruse) were allowed to intervene and respond to the motion. Upon appeal by the intervenors from the Clerk's order appointing a commissioner, the Superior Court affirmed, and intervenors appealed to this Court. We held that C. W. Misenheimer, by his actions, abandoned his contract and could not have forced a consummation of the sale and movants Query had no greater right to consummate the 1907 contract than C. W. would have had if he were living. *See also McRorie v. Query*, 23 N.C. App. 601, 209 S.E. 2d 819 (1974), reversing the Superior Court's summary judgment dismissing the action and remanding the matter for hearing.

It is from that trial on the merits that the present appeal comes.

Plaintiffs first argue their seventh assignment of error, and since we are of the opinion that resolution of this question is dispositive of the appeal, we shall also discuss this question first. Plaintiffs contend that the court committed prejudicial error in submitting to the jury the issue submitted by defendants with respect to the feme plaintiffs' laches.

[1, 2] They first contend that the defense of laches is not applicable here because this is an action in ejectment. They cite no authority for this position, and we find none. Authority for the contra position is *Hughes v. Oliver; Oliver v. Hughes*, 228 N.C. 680, 47 S.E. 2d 6 (1948). *See also Poultry Co. v. Oil Co.*, 272 N.C. 16, 157 S.E. 2d 693 (1967). They also take the position that feme plaintiffs could not be guilty of laches because action was brought within any applicable period of limitation. In *Teachey v. Gurley*, 214 N.C. 288, 294-95, 199 S.E. 83, 88 (1938), the Supreme Court said:

"Whenever the delay is mere neglect to seek a known remedy or to assert a known right, which the defendant has denied, and is without reasonable excuse, the courts are strongly inclined to treat it as fatal to the plaintiff's remedy in equity, even though much less than the statutory period of limitations, if an injury would otherwise be done to the defendant by reason of the plaintiff's delay. Thus, where the property has greatly increased in value, es-

pecially if through the efforts of the defendant, unexplained delay of a very short time may be laches. . . . "

*See also Taylor v. City of Raleigh,* 290 N.C. 608, 227 S.E. 2d 576 (1976).

[3] If defendants are entitled to assert the defense of laches in this case, and we conclude that they are, we must determine whether the court properly submitted an issue thereon to the jury.

> " ' Laches' is negligence consisting in omission of something which a party might do and might reasonably be expected to do towards vindication or enforcement of his rights, being generally a synonym of 'remissness', 'dilatoriness,' 'unreasonable or unexcused delay', the opposite of 'vigilance', and means a want of activity and diligence in making a claim or moving for the enforcement of a right, particularly in equity, which will afford ground for presuming against it or for refusing relief where that is discretionary with the court, but laches presupposes, not only lapse of time, but also the existence of circumstances which render negligence imputable." *Wynne v. Conrad,* 220 N.C. 355, 361, 17 S.E. 2d 514, 518-19 (1941).

Lapse of time is not, as in the case when a claim is barred by a statute of limitation, the controlling or most important element to be considered in determining whether laches is available as a defense. The question is primarily whether the delay in acting results in an inequity to the one against whom the claim is asserted based upon " . . . some change in the condition or relations of the property or the parties." 27 Am. Jur. 2d, Equity, § 163, p. 703. Also to be considered is whether the one against whom the claim is made had knowledge of the claimant's claim and whether the one asserting the claim had knowledge or notice of the defendant's claim and had been afforded the opportunity of instituting an action. *Id.* at § 162, p. 701.

[4]. We must now consider whether the evidence was sufficient to support findings by the jury that plaintiffs delayed an unreasonable length of time, had knowledge that defendants claimed the property, that defendants had no knowledge that plaintiffs claimed the property, and whether plaintiffs' delay in bringing this action has ". . . prejudiced, disadvantaged, or injured the defendants." *Taylor v. City of Raleigh, supra* at 624, 227 S.E. 2d at 586.

Defendant Query testified that he purchased the property and moved on it on 22 March 1947. He did not know Mrs. McRorie but did know Mrs. Burgess, who lived in the vicinity and passed his house often. When she passed when he was mowing the grass, they would " . . . throw up our hands at each other." She passed frequently. Neither Mrs. Burgess nor Mrs. McRorie ever contacted him or indicated in any manner that they owned or claimed an interest in the property. Neither did Mr. Cruse ever personally or through anyone else communicate to Mr. Query that he owned or claimed an interest in the property. Mr. Query had never heard of a lawsuit between Rosanna Misenheimer Taylor and J. J. Honeycutt. No one had ever contacted him to determine whether he would be interested in purchasing any interest which he did not own in the property. He was aware of the suit against Billy Ray Creswell but no one ever told him that that suit might involve his property. His first knowledge that anyone claimed an interest in the property was when the sheriff served the papers in this suit on him on 10 June 1968.

Query returned the property for taxes and paid ad valorem taxes every year from 1948 to the time of the trial.

Since 26 December 1965, to the date of his testimony (3 March 1976) Mr. Query had made improvements to the house other than the normal month-to-month or year-to-year maintenance. He testified " . . . I covered it and I paneled the breezeway and we put carpet on all the floors and put in a tile bath and I put in a central heating system, as well as built-in air conditioning. All this has been done after December 1965. I replaced the roof because I needed a new roof and had to have it."

Defendant Martin testified that he had no knowledge of any controversy involving the Misenheimer estate until 1954; that no one ever communicated a claim to him while he owned the property; that any increase in value of the land had occurred from 1954 to 1968 (the date of feme plaintiffs' deed to plaintiff Cruse) : that he had known the feme plainiffs since they were young children and known plaintiff Cruse for some 12 to 15 years.

Plaintiff McRorie testified on cross-examination, that she had known as a child of 13 or 14 of the deeds exchanged between her parents and C. W. Misenheimer, and of the deed of trust to Crowell, Trustee, and of the foreclosure. In 1950, she

learned of the deed from Martin to Query. She knew there was a house on this property not long after it was built but was not by there often enough to notice any improvements. She never communicated to defendant Query that she claimed an interest in the property or would own it at her mother's death. "Right after my mother died on the 26th day of December, 1965, I was of the opinion that that property then belonged to me. . . . " She waited until June of 1968 to institute this action to obtain possession of the property because they had started an action against Creswell and " . . . were not finished with that one." In 1954, she conveyed to her attorney, plaintiff Cruse, an one-half interest in the property.

Plaintiff Burgess testified that she knew there was a house on the property but did not pass there regularly. She was present when Mr. Honeycutt talked to her mother about buying some property and knew of the suit against Honeycutt and that Mr. Cruse was one of the attorneys involved. She gave a deed to Mr. Cruse in 1954 for one-half of whatever she might be entitled to receive from her grandfather's estate. " . . . I did this because the Country Club was trying to buy our property for nothing and we had to come to you, Mr. Williams and talked to you about it and you said the deed was not any good. As to why I gave Ken Cruse a deed for one-half of whatever I might be entitled to, it was because we had been to other lawyers and all of them had turned us down and we had paid other lawyers too, you included, who had said the deed was no good." No money was given for the deed. The feme plaintiffs wanted to give him the deed because " . . . he was doing work for us . . . trying to clear the deed." After the deed was given to Cruse in 1954, the next thing which was done was to bring the suit against Creswell. That property was a vacant lot. No claim was ever made against Query until this suit was instituted. She did not know of the deeds and deed of trust given until they began to check the deeds and when her mother told her about them in the fifties when they went to talk to plaintiff Cruse. Neither she nor her sister had ever listed the property for taxes.

Plaintiff Cruse testified that he was familiar with all of the deeds introduced into evidence and with the final account filed in the estate of George Misenheimer. He represented defendant Honeycutt in the suit against him brought by feme plaintiffs' mother. At the time of the conveyances to him by feme plaintiffs, he did not know there was a house on the prop-

erty or that defendants Query were residing there. He did not know where the boundaries were, and it took him some years to see where the various lots were. He knew that if this property was not worth anything at that time that the feme plaintiffs might have been able to convey the property to defendants Query for some consideration. At the time he took the deeds from plaintiffs, Mr. Burgess and Mr. McRorie came to see him and talked about the whole situation. He gave them his opinion that Mrs. Taylor could not give good title and that the ultimate remaindermen could not be determined until her death. They agreed that if he would attempt to straighten it out at her death they would pay him as a fee one-half of what could be recovered, excluding the graveyard lot which was not involved. He did not attempt to sell to defendant Query his contingent interest or that of his clients. In 1954 there were some 30 individuals in possession of property in the Misenheimer estate in which he claimed an interest. The only one he contacted prior to instituting suit was Billy Creswell. He did contact Creswell and told him that he claimed an interest in the lot Creswell "owned." He did not bring suit against Query at the same time suit was instituted against Creswell for possession of the southern half of Lot 1 because he felt Creswell would be the easier of the two suits and he wanted to get that one over with first. He waited to bring this action on instructions from his client. His interest in the property never came to the attention of the court in the Creswell action and he was not a party. In this action, the complaint alleged that feme plaintiffs are the sole owners.

We think the evidence is more than sufficient for submission to the jury on the question of laches. Certainly as early as 1954 the feme plaintiffs knew that they intended to claim the property at the death of their mother and wanted to sell it before then for the benefit of their parents but were advised they could not give good title and that the mother could convey only a life estate. Very shortly after their mother's death in 1965, they brought suit to recover the southern one-half of Lot 1. There was no good and sufficient reason that they could not have also brought this action at that time. The only reason given by them was that they wanted to try the other action first. The jury could have found from the evidence that at least Mrs. Burgess was aware of improvements being made to the house, since she lived only a quarter of a mile from the property and passed it regularly.

There is no evidence with respect to the cost or value of improvements made by defendant Query after 1965. Common knowledge would dictate that the improvements made as testified to by defendant Query would cost a sizeable sum of money. There was also evidence that the property increased in value from 1954 to 1968. We think the evidence clearly indicates that plaintiffs negligently omitted to bring their action for an unreasonable length of time to defendants' prejudice. There can be no question but that an opportunity to bring the action immediately upon their mother's death was open to them, and they were well aware of the necessity to bring an action in order to obtain possession of the premises.

Indeed the situation here is very analogous to the situation in *Taylor v. City of Raleigh, supra,* where the Court held that plaintiffs in that case, which was tried before the court without a jury and upon an agreed statement of facts, were guilty of laches as a matter of law and affirmed the trial court's entry of summary judgment. There, plaintiffs brought their action to have declared unconstitutional two ordinances adopted by the City of Raleigh. The action was brought two years and 22 days after the rezoning ordinance was adopted. In the interim the individual defendant had expended some $23,000 in fees for architects, engineers, and attorneys.

Plaintiffs further argue that the court erred in failing to charge on the legal effect of the documentary evidence and exhibits introduced by plaintiffs. This was evidence to prove plaintiffs' title. The second issue submitted to the jury was: "Are the plaintiffs the owners in fee simple of the northern half of Lot Number 1, and have they been since December 26, 1965, as alleged in the complaint?" The court clearly instructed the jury that if they should find that the plaintiffs were not guilty of laches, it would be their duty to answer the second issue "Yes" if they found the facts as all the evidence tended to show. We cannot perceive any prejudice to plaintiffs in the failure of the court to read and explain all the documentary evidence. He did call to the attention of the jury all the documentary evidence introduced and listed it for the jury. Plaintiffs did not request additional instructions. In view of the peremptory instruction on the second issue, plaintiffs are in no position to show prejudice.

Plaintiffs also contend that in several places in its charge the court referred to actions of the parties prior to 26 Decem-

ber 1965, and that these references were inconsistent with the instruction that laches would only apply after 26 December 1965. There is no merit in these contentions. The court clearly instructed, on several occasions, that the period of time to be considered in determining whether plaintiffs were guilty of laches was from and after 26 December 1965. The dates of possession of Martin and Query and the evidence with respect to whether plaintiffs knew of their possession and alleged ownership and plaintiffs' knowledge of transactions affecting the property prior to 1965 went to the determination by the jury of plaintiffs' knowledge of a claim adverse to their own which would necessitate their immediate action upon the death of their mother.

Plaintiffs also assign as error the admission of testimony of defendant Martin that plaintiffs had never made any "claim to" him and his testimony that the property had increased in value three or four times from 1954 to 1968. Again, plaintiffs should not be heard to complain, because plaintiff Cruse gave the same testimony with respect to increase in value and all plaintiffs testified that they had not communicated their claim to the property to anyone in possession of the property.

At the end of all the evidence, plaintiffs moved that defendants be required to elect the remedy they sought, i.e., whether they relied on their title by mesne conveyances or laches. Prior to that motion, the court had advised the parties that it would submit two issues—one with respect to laches, and one with respect to plaintiffs' title to the land. We fail to see any inconsistency in these issues. The court, in effect, instructed the jury that title was in plaintiffs, but if they were guilty of laches in asserting their claim to possession, they could not prevail. No election of remedies was necessary.

Defendants made cross assignments of error and have argued them in their brief. However, in view of our disposition of the appeal, it is unnecessary to discuss them. Suffice it to say that we think the court correctly limited the issue of laches to the period of 26 December 1965 to 10 June 1968. We are quite aware of the suggestion of Judge Britt in *McRorie v. Shinn, supra,* and of the provisions of G.S. 41-10. However, since this question is not before us, we do not discuss it.

For the reasons stated, in the trial of this matter we find

No error.

Chief Judge BROCK and Judge BRITT concur.